The next case today is We The People PAC et al. v. Shanna Bellows et al. Appeal No. 21-1149. Attorney Anton, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors, and may it please the Court. Assistant Attorney General Jason Anton for Appellant Secretary of State Shanna Bellows and Deputy Secretary of State Julie Flynn. Judge Kayotta, I'd like to reserve three minutes for rebuttal if I could. Yes, you may. Thank you, Your Honor. Maine's Constitution, through the initiative process, reserves for its citizens a portion of the state's legislative power. To this end, it also reasonably sets limits on who may exercise such power, in that both those who vote on initiatives and petition circulators, the gatekeepers of ballot access, must be Maine residents and registered voters. Until this case, Maine's circulator requirements had consistently been upheld as constitutional in both state and federal court. Yet despite a lack of evidence establishing a severe burden on plaintiffs' expiring petition campaign, or any impact on a hypothetical future campaign, the district court applied strict scrutiny and granted a preliminary injunction. This was error. Beginning with Buckley, given its outsized role in this case, Buckley does not support the extreme version of the constitutional standard that any limit on the pool of circulators triggers strict scrutiny review. What mattered to the decision in Buckley was that Colorado's law imposed a significant restriction and indeed limited to a significant degree the number of Coloradans who could circulate petitions. The number was as high as 35 percent. There was some discrepancy in the record as to precisely how were not registered to vote in that case. The number is substantially less here in that 97 percent of Mainers are registered to vote, and indeed there's evidence of only a single person who does not wish to register to vote, unlike the evidence in Buckley where several individuals, including one plaintiff, indicated that as a form of political protest, they did not wish to register to vote. So what Buckley underscores, and as a reminder, Buckley assumed that a residency requirement would be constitutional without deciding that fact. It underscores that it is a fact-intensive inquiry as to the character and magnitude of the burden under the Anderson verdict test, and that that is what dictates the level of scrutiny applied to Maine's laws. So how, just starting with the residency requirement, how are we supposed to think about the denominator? It's a First Amendment interest to participate in the initiative process. Your argument, at least as I hear it, sort of starts with the presumption that the right denominator is state residents. But if it's a First Amendment right, there's no reason why it's a First Amendment right only of Mainers. So then if we say the First Amendment right is anybody who has the right, that's everybody in the country, so then the denominator is very, very large. So the burden's very, very large because all these people can't be reached out to. Well, what's wrong with thinking about it that way? I think the analysis would ultimately be besides the point if the denominator were everyone in the country. I don't think that's how the Buckley court addressed the burden on petition campaigns within a given state, nor is it how Meyer necessarily addressed the problem. But it assumed it away, so just why isn't that the right way to think of it, given the nature of the right as described in Buckley? It's the right to participate in the is the burden on the campaign, Your Honor, and that's the burden that the plaintiff... I thought they were also describing the individual right of the circulator to participate. I think our argument in this case, and I apologize if I bleed over into the interest piece, is that the right in this case, because it is set forth in Maine's Constitution and involves initiative campaigns in Maine, that that right is only held by Mainers to participate in the campaign. But that's true. The state law, but the First Amendment right, I thought there was a First Amendment interest of any citizen to participate in politics, just like I have a First Amendment right to speak about a Maine initiative, even though I'm in Massachusetts. Why don't I have a First Amendment right to go out and campaign for an initiative? I could certainly hold a rally and drum up support for it as a Massachusetts resident, and as I read the cases, that First Amendment right is only held when it comes to taking the non-governmental act of circulating petitions on behalf of a candidate. Well, we think there still is certainly, as you pointed out, Judge Barron, a right to hold rallies, to speak on a petition campaign. Maine's laws don't restrict that sort of speech. It's solely the ability to serve as a petition circulator in the context of the initiative campaign. But I'm saying that person, are you saying that person has no First Amendment rights? We're arguing that it isn't a severe burden on those rights, because of, that there isn't a severe burden imposed by the laws on any individual's First Amendment rights. Because as in cases like Yeager, and as in Hart, and IRI, and Jones, these campaigns are still able to function and be successful using... We're just, I think, talking past each other slightly. I apologize, Your Honor. You keep talking about the campaign. I keep talking about the person who wants to participate. So our argument would be, Your Honor, that based on the case law, the denominator should be those in state and not those out of state. But that even if you're correct, if we grant the court that the denominator should be all those within the United States who should be analyzed as having a First Amendment right is potentially burdened in this case, that no severe burden has been imposed, and that the way the Anderson verdict framework has been applied in cases in both the Supreme Court and elsewhere is not to look at the denominator as the 350 million people in the United States, but rather the universe of circulators within a given state, or the universe of circulators even who might be out of state. It's a smaller denominator, I think, even as Plankett's make the argument, that there is a universe of out of state professional circulators that they wish to use, and that that's the proper frame for the Anderson verdict analysis. And it ties back into, I think, the general framework for cases like this in that states have considerable leeway to regulate their own election process and to limit participation to citizens. Maine has some referenda coming up, and someone in Massachusetts sent letters to people in Maine and published a letter in the newspaper urging people to sign the petition. Of course, yes, they can absolutely do so. The only thing that Maine's constitution and statute limits is who can act as a petition circulator, and it's defined in the statute as the person who solicits signatures for the petition, for the initiative, I apologize, by presenting the petition to the voter, asking the voter to sign, and personally witnessing that voter placing their signature on the petition. It is that core function. Right, and I would have thought that was a good argument until I read Meyer, and Meyer says that the circulation of the petition is itself core political speech. So how do you deal with that? I'd say a couple things about Meyer. First of all, I think the component of circulation, which is core political speech, is still permitted in that precisely as you suggested, an out-of-stater could come in and stand next to a circulator and sit there and advocate for someone to sign the petition. That wouldn't be forbidden by Maine's constitution or by Maine's statutes. I understand that you're relying a lot on Maine, the Maine Supreme Court case, but that was pre-Buckley, and most of the cases since then have tended to apply Anderson verdict to find a significant burden by excluding circulators and really are looking more at what the state interest is and whether it's justified. I mean, it doesn't seem as if under the trend or the bulk of the case law, it's that hard a burden in these circulator cases. So Hart, you're right, was pre-Buckley. IRI and Jones were post-Buckley. But I can address, sorry, your honor, I have more to say. The cases are all but one, I believe, are nominating petition cases. They didn't involve preliminary injunctions that involved candidates for national office, presidents, senates, and house members. In fact, the Wilmoth case in the third circuit recognized that the consensus was with respect to nominating petitions. Here we have a right that is guaranteed in the Maine constitution to Mainers. And so it distinguishes those cases from what we have here. And what we submit is that when that particular question was presented to the court, both in Maine's law court and to the district of Maine prior to this case, that the consensus was that those restrictions were constitutional and that they served. Let me just ask you just a following on Judge Kada's question so I get the analytics of it. Right. Does an individual circulator have a First Amendment interest in being a circulator? I think there is a First Amendment interest, yes. I don't think we could conceivably argue that there isn't one that exists. And that's because what they're engaging when they do that is what? It's First Amendment protected activity. It's political activity, correct? Right. And the minor court's analysis on that was that part of what circulating a petition is, is speaking and trying to convince someone to sign. Okay. So just going back to Judge Kada's thing, the thing I find a little bit puzzling is that First Amendment protected activity would seem no less something that somebody out of state engage in than somebody in state could engage in, just like writing a letter. The state interest in regulating it might be different because of the nature of the activity. But with respect to the burden, it seems pretty self-evident to me that if I have that interest and I'm being told I cannot engage in the activity at all, it would seem to be a pretty severe burden on that activity, just per se. What's wrong with thinking about it that way? I think there's two things, Your Honor. First, the Meyer case didn't ultimately decide that there is a restriction on an individual serving as a circulator, and therefore the analysis ends. That is a severe burden on that circulator. And that is a severe burden that leads to strict scrutiny. Rather, the court concluded that the law at issue in that case, which was a pay on audience for the campaign, it also reduced the likelihood of that campaign qualifying for the ballot. Those were the two burdens that the court analyzed in Meyer. Second of all, as the brief decision from the Ninth Circuit recognized, Buckley modified that analysis in that it determined that it's not just an impact, but rather the degree of the impact that matters, in that there was a 35% of Coloradans. No, I understand. What I'm having trouble figuring out, though, is just the logic of it. Maybe you can help. If I have a First Amendment interest in engaging in the speech activity of circulating the petition, how is the burden on a prohibition against my doing so because of my out-of-state status reduced by the fact that other people who are in-state can do it? I understand how it reduces the burden on the campaign. I just don't understand the logic by which you could say it reduces the burden on the person whose First Amendment interest is under attack, which is the out-of-state person that wants to circulate. I think the problem would be, Your Honor, is that if it was a single person, if it was always a severe burden for a single person to be restricted from circulating an initiative, no restriction of any type would ever survive except with a compelling state interest. And I think the case law that we have from the Supreme Court suggests that the proper It might be different if you say, you know, you can't do it for pay, you can only do it for free. That wouldn't necessarily be the same level of burden as here, which is you cannot do it at all unless you move to Maine. Well, that's the other aspect of the argument, Your Honor. And this is was relevant to the Yeager case that the same speech, the speech element of the circulation can still be engaged in by any individual from any state. I'm happy to finish answering Your Honor's question if I may. So you're distinguishing, I think right now with your last remark, if I'm does to urge people to sign the petition and explain why and lobby them and on the one hand, which is First Amendment, and then on the other hand, the attestation of the signature. Is that the distinction you're having a straw? Yeah, so there is that's correct, Your Honor, and that there is a an election process that is essential if courts have described it as vital to the exercise of Maynard's right to engage in an initiative petition, and that is the witnessing of the signature and making sure the signature is who it purports to be, and then attesting to that when the signature is submitted. And of course, we maintain, we didn't get into this, but that the the interest that the state has in this restriction, regardless of how Judge Barron, your question is resolved, are compelling and would justify these restrictions. And I can get to those issues and irreparable harm in rebuttal. Well, can I ask you about irreparable harm since you pressed it? It's the last day and in fairness to the judge, he got it on New Year's Eve and he issued a decision within a month or two on a very hard case. So there is that line of cases, which is any impingement on First Amendment rights is irreparable harm. Do you think that saves it or the fact that the petition deadline passed eliminates irreparable harm? I think it eliminates it, Your Honor. The dates are January 16th. The date the decision was issued is the date that the signatures under the Constitution were due to the individual municipalities to be checked. There could be no more circulation at all. So I agree with you that there is a line of cases that supports the idea that any restriction on First Amendment rights is irreparable, but there was no ability even for the circulators here to exercise that First Amendment right because the petition had concluded and the petition drive had concluded. And here in this case, there was no evidence that another petition drive was going to be filed. Certainly none had been filed, such that there would be irreparable harm that justified entering extraordinary relief rather than proceeding with the summary judgment process, gaining a full record rather than the rushed record that was produced here in just over a week in order to resolve the important constitutional questions at issue. Are you talking about irreparable harm or it sounds almost like talking about a combination of mootness and standing? We argue it as irreparable harm, Your Honor, because there needed to be some sort of continuing violation of First Amendment rights. And the way that the district court argued it was that there is a hypothetical future campaign that they could refile and that justified a preliminary injunction, which we don't think is correct as a matter of law under Respect Maine. But the mootness question is an interesting one. It's one we haven't briefed with respect to whether the lack of an existence of a petition drive would have caused trouble either on mootness or standing grounds. I expect there may be some argument if it goes back to the district court, and certainly Attorney Rossi can address this, as to whether there would be an amendment to the complaint because there's now a new petition drive that was filed two months ago, or whether there's argument as to capable of repetition but evading review. But you're right that there is overlap between those concepts. We would urge the court, because it's clear from the record here that there was no evidence to support continuing irreparable harm so as to issue a preliminary injunction as is required. So the way to think about it is to address likelihood of success. If we think there's a First Amendment problem here, and your view is that there wasn't irreparable harm, so you just vacate the injunction or remand it. Is that how you think about it? So we don't think, we're happy for the court to address, I'm sorry, Your Honor, if you have another point to make. We're happy for the court to address the constitutional question. We believe that the constitutional question should be resolved in Maine's favor because of its strong interest in limiting the participation in the process to Mainers, but that an alternate ground for vacating the order that was issued on February 16th is that, as is required for a preliminary injunction, there was no irreparable harm. And absent irreparable harm, the court could not have entered Extraordinary. Could you just help me on that point? What do you have in is the kind of showing that would have to be made. Take a case in which it's not an out-of-state, let's say it's just the circumstance in Maine. Maine says that only people in the eastern half of Maine can be circulators, so there's no question there's a violation. But the case was filed on the eve of the last referendum, it's open, and all we know is another one may happen in the future, and they say if there is one, we'll participate in it. Presumably, the argument's exactly the same as in this case. You'd say no irreparable harm there, no injunction can lie, notwithstanding that there's a likelihood of success. What kind of showing are you imagining needs to be made to justify the imposition of the preliminary injunction when the likelihood of success prong is met? I think there'd have to be, it would be quite easy in this case. There could have been evidence that we are going to resubmit, we're going to refile this next week, something like that. It's the exact same question as the mootness issue then. In other words, if all you need them to do is say we are going to do it again, if they weren't going to do it again at all and they had vowed they weren't going to do it again, there might be a real mootness issue. But if you're saying all they need to do is have enough to say, again, it doesn't seem all that different from the mootness inquiry itself. I thought you were suggesting irreparable harm, given the extraordinary nature of the remedy, required something more than the showing that it will happen again, that they had to show why they needed the injunction in the interim or something like that. I think that's part of the standard, that the injunction is necessary to prevent irreparable harm. What do you have in mind? What is that? What showing are you saying is lacking that they need to make? For example, perhaps, and I'm speculating as to what Attorney Rossi would have put together, but perhaps they indicated, we're going to refile a new campaign. We have attempted to recruit 60 paid out-of-state circulators. They're ready to go. We could only find five in-state circulators, and so we need the preliminary injunction. Isn't there an individual circulator in this case? There is, plaintiff Kowalski. What does that person have to show to get the preliminary injunction? Isn't it enough for her to say, I'm going to do it again? If they're right on the First Amendment question, and they have shown a likelihood of success as to, let's say, an individual circulator, and they said, there is a campaign being filed that I'm planning to come to the state of Maine next week to circulate, should an injunction be entered, then perhaps, yes, that would be sufficient. But we don't have that showing here, and in fact, we don't even have a showing as to a burden on that future campaign at all, because it didn't arise. It wasn't even mentioned as a possibility until the interrogatories were answered, and then it wasn't even suggested that it would actually be filed until a memorandum of law, and that's the issue here, that there had to be some sort of more concrete showing as to imminent harm as required by the circumstances. Why is an interrogatory answer not evidence? The interrogatory answer is evidence. We have our own separate issues, which I could go into with the interrogatory answers, but all the interrogatory answer said was, we have the ability. We recognize we have the ability to refile. They did not make an affirmative claim that they were going to refile the initiative. In fact, they did file something entirely different at the same time they filed the briefcase. Are there any more questions for Mr. Anton? Thank you. Mr. Anton, please mute your audio and video at this time. Attorney Rossi, please unmute your device, and introduce yourself on the record to begin. Good morning, your honors. Paul Rossi for all appellees. Hello? Am I not coming in? I think we can hear you. I can hear you. Okay. You may please the court. I'm having video trouble here. Hi, Mr. Rossi. It's Dan Toomey here. Can you see the three judges? I can see the three judges. Okay. And can you hear me? I can hear you, Mr. Toomey. Okay. Why don't you go ahead and begin your presentation? You may please the court. After initiative referendum v. Yeager, and following the analysis of the Supreme Court in Meyer and Buckley, every circuit court to consider the constitutionality of voter registration and residence requirements being imposed on petition circulators have unanimously ruled that such restrictions impose severe burdens on court political speech because they reduce on their face the pool of circulators available for proponents of initiatives and also candidates, which necessarily impairs the right to select who will convey their message to the voters. The number of voices available to communicate the message and reduces the size of the audience they can reach. The lower court should be affirmed because it properly applied strict scrutiny analysis. And to Judge Barron's point, the number of voter registration requirements the state has argued is in support of the residency restriction. And the residency restricts 330 million Americans from engaging in core political speech in the state of Maine. Within these 330 million excluded individuals are the best professional petition circulators in the United States. They do not reside in the state. That is why this is such a severe burden when you restrict circulation to only Maine residents. Well, can I just, you're doing the same thing in the sense that you're now sliding into the burden being on the campaign rather than the individual, which is fine, but it may be that that matters if there's any force to this distinction between advocating for somebody to sign a petition and attesting to the veracity of the signature. Well, I agree. I would argue that the burden is both on the campaign and on the individual circulators. Individual circulators have the right to enter into Maine and ask Mainers and provide the opportunity to sign an initiative petition. They say all that, but if I'm understanding the state's position is that's all true and nothing stops and they just can't be the witness for it. And why is that a First Amendment interest to be the witness for it? Well, actually, for instance, in most situations, the burden, the out-of-state circulators can't come into states and in-staters have to witness. And even that has been struck down, for instance, in Libertarian Party versus Virginia. Requiring to have two people there being paid to get one signature is itself a burden. I understand the burden on the campaign, and then we get into the issue of how big a burden it is. If we're focused on the circulator, I understood Maine to say don't focus on the circulator because all they're sparred from is being the witness. And it's not the same First Amendment interest in being a witness as there is in telling people I really want you to sign and I'll take down the signature, but to actually witness it in a way that will be recognized by the state. Why is that a First Amendment interest? It is a First Amendment interest because the act of actually getting the signature, holding the petition, there's a special skill set in petition circulators. They have professional... I'm still sort of stuck. Under the Maine law, can't an out-of-stater do that? I thought they can't even do that. I thought they just can't witness it. They cannot actually hold the petition and make the ask. The 2015 amendment, which was specifically to exclude liberals from coming into the state of Maine and initiating these initiative petitions because the utility and the value of out-of-state professional out-of-state circulators is so high that they wanted to exclude those people from the petitioning process. Out-of-state circulators are not under the law allowed to actually hold the petition, make the ask. So if they can't do that, there's no reason for them to be there because their entire skill set is eliminated from the process. So it's not just a prohibition on them being witnesses? No, they're not allowed to actually hold a petition and make the ask. That's their skill set. That's the utility that they bring for themselves and for the campaign. That's why the 2015 amendments in particular and the residence restriction in Maine is the most severe restriction ever imposed in the United States. They are not allowed to touch the petition, make the ask. It has to be the Maine registered voter. And it's not just a registered voter. It's a registered voter who currently resides at the address listed on their voter registration, which is why this number is complete hogwash. But the injunction is broader than that. Let's assume everything you just said is correct. That still leaves the reach of the injunction, I think, implicates Judge Barron's question because the injunction also, as I read it, of the attestation residency requirement. Well, yeah. And the answer to that is what every other court has done is that out-of-state circulator submits the jurisdiction of the state of Maine as a more... No, no, no, no. That's not the question. The question is, if we focus for a minute on the First Amendment rights of the circulator, realizing that you have an argument that the sponsor and the hire of the circulator also has implicated rights, but if for a moment we focus on the circulator, and if we take as an assumed given that the circulator has First Amendment rights and doing all the things you just said, advocating, holding, please sign it, here's where you sign it, narrow it down to the attestation of the signature, how does that him or herself? Very well, because if the out-of-state circulator can't do the attestation, then they must have a Maine resident with them witnessing the signature process. Sure. Okay, that means two people. First of all, that means that the out-of-state circulator is essentially by only being able to circulate when that witness is willing to circulate with him. That circulator can only go where that witness wants to go. In fact, in the industry, in-state witnesses who can attest to the petition are called anchors because they slow the process down, and these out-of-state circulators are professional circulators, and they get paid when they wrote valid signatures. To that point, Mr. Rossi, just so I understand how it works, does state law require the person who attests to the witness of the signature to be present at the time? Absolutely correct. Can I ask about the burden that's imposed? If we say we agree that there's a significant burden and you need to have a compelling interest, the Maine statute actually has a fairly short tether for the secretary. She only has 30 days to determine the validity of the petition. Even with an affidavit about, here's my address, etc., if you're in Maine and the person has gone back to Louisiana or wherever, it might be hard actually within 30 days to pull this all together. Is there a strong state interest here in trying to be able to reach the person that right away? Yes, there is, but that 30-day period is sufficient time to serve process and for the circulator to get back to Maine, and it's in that circulator's interest to do so because they don't get paid unless that signature is validated. As this court is aware, this is just the latest of a line of states that have proceeded in all these circuits that have struck down these residency requirements as unconstitutional in favor of submitting to the jurisdiction of states. There is not a single instance across the country where an out-of-state circulator has failed to return to the jurisdiction and provide a testimony request. There isn't any evidence. Were all those other states, was the Secretary on such a short tether? Absolutely. In any election, well, there are about five minutes left. There are certainly states that have that kind of short process. I'm not saying that all have 30 days. I don't want to misrepresent anything here, but I know in Pennsylvania and in California, it is a similar, in Pennsylvania, it's a candidate petition. We don't have a petition here in Pennsylvania, but there is a 10-day period in Pennsylvania, and out-of-state circulators' candidate petitions routinely come back and defend their certain process. They come back and defend it, and there isn't a single instance in Pennsylvania where I'm aware of any country for both candidate and initiative petitions where out-of-state circulators have failed to do so. It's in their professional interest. If they don't do it, they're out of business. It's in their professional interest, their economic interest, and furthermore, they've signed the contract to come back to the state. They have a legal interest and requirement to do so, and that gets to this. Assuming you accept that strict scrutiny applies, the government has the burden of proof to demonstrate, to prove that this alternative method that has been adopted by all your courts submitting to the jurisdiction of the state doesn't work, and they haven't put any such evidence that the alternative that we're advocating and the lower court has instituted doesn't work. They have completely failed. There's nothing in the record. They haven't even attempted to show that submitting to the jurisdiction of Maine doesn't and proving that the submitting jurisdiction of Maine does not work, and that's a huge failure in the part of their case and certainly supports the affirmance of the lower court's opinion, because certainly strict scrutiny here applies, and they have failed to make any evidence that this alternative method doesn't work. If there was anything in the record where circulators had failed to respond to a subpoena within the time allowed, they certainly would know about it. Certainly, attorney generals from across the country talk about these kinds of cases, and it would be readily available. There is none because it has not happened. Can I ask the irreparable harm question? Yes, please do. I'm glad you're getting to it. So, it was the last day. The petition was over. It failed. I do understand that any violation of the First Amendment is technically irreparable harm, but as a practical matter, how can you find that? As a practical matter, they actually circulated petitions under this injunction, and they got over the top because of signatures. Now, a certain number of those signatures were invalidated so that you could get on the ballot, but they actually got over the threshold of the 64,000 number. They submitted over 64,000, and that amount that got them over to allow them to file the petitions actually occurred because of this injunction, and we specifically represented to the court below that because of the way Maine works, we still have time to get into the 2020-2022 ballot, that this is absolutely necessary now to allow the proponents to pull the trigger once they get back to the Secretary of State's office and circulate petitions because this is an expensive process, and without the certainty that they can use professional circulators for their forthcoming petition drive, that is irreparable harm because without that guarantee, without this injunction, there's no guarantee that they can get on the ballot. There's evidence in the record to support that proposition for the irreparable harm? Yeah, it's in the, absolutely, and it's in the opinion. And I'm confused. Go ahead, go ahead. I was going to say, I thought it was a different kind of petition that was filed after the injunction. They have switched the issue. They've decided to go to a, they're going to do the, they're going to do the citizen voting thing later. They've decided now to switch to the, to the voter ID issue. Both issues, they're going to do both issues. They've just decided for technical reasons and for strategic reasons to do this issue, but they have always said that there's still time to get onto the 2022 ballot. They, and they have filed, Secretary of State's office has been very slow in, in, in validating this. They have the money raised, they're ready to go. And if this injunction is in place, they can pull the trigger. Without this injunction, they, they have, they will not make the ballot in 2022. It is irreparable harm. And, and by, and it, and the injunction allowed them to, to file because they got over the 64,000 mark precisely because it's an injunction. Could you just, I guess if you could give me a couple of sentences on how practically speaking, the injunction is helping them that they couldn't do the preparatory work in the absence of the injunction. And then the second thing is, sounds like the evidence you've got is evidence about what the campaign would be doing. And is there, what is the evidence with respect to the individual circulator plaintiff about irreparable harm? We actually, we didn't, we didn't address this because we were focused in on the last injunction, but the same circulators, the same professional circulators are going to be employed for the, for the forthcoming. What is in the record about the with respect to reputable harm and their future participation? Oh, it's not in there because it, we, it, because we were focused in on the current, but, but I think, is there anything even to suggest that individual circulator is going to participate in the next round? They are, they all know anything in the record. No, no, no. You're on. Okay. And then with respect to the campaign, what does the record show that suggests that the preparatory work you're talking about is something that the injunction is necessary to facilitate? Well, I would, we didn't address that in the record on the preliminary injunction that, and, and, and I, that if we are not going to do this now, we are going to do it in the future. We have filed. And if your honors, I would like to make one additional point. Chris Love completely rejects the, the, the, the, sort of the, that the integrity of the process and keeping out of stators that they don't have a right to participate in Maine politics with respect to initial petitions with respect to integrity of the process. The fact that only Mainers can sign the petition that the signatures are validated by the secretary of state's office protects Maine's integrity of the process. And the, the notion that only main voters may participate in their, in, in this process is also rejected by Chris Laws at, and that's at page eight for both you. Thank you. At this time, Mr. Rossi, please mute your audio and your video. And what attorney Anton unmute his audio and video and reintroduce yourself to begin. May it please the court, Jason Anton for appellants. I have a few quick points that I want to address and I'll start with the irreparable harm piece. It is impossible for the preliminary injunction to have had any impact on the campaign because under the constitution, the signatures were due the day of the order was issued to the municipalities. So it could not have made a lick of difference as to how many signatures they were able to get. Second of all, with respect to the evidence in the record, we've already discussed, your honors have already discussed the lack of evidence as to individual circulations, but the only piece of evidence, and I'll read from the interrogatory, that exists as to the campaign is plaintiffs are also aware that if they do not collect the required number of signatures to meet the current February 2021 deadline, plaintiff can immediately refile the initiative petition and still make the 2022 ballot. That's the only piece of evidence that doesn't indicate affirmatively that they're going to do so solely in awareness. And I think that's what's important to there being no immediate impact prior to the issuance of extraordinary relief. The other aspect that I wanted to address is the interest in that the state's sole interest is not the ability to track down circulators. Though, as you pointed out, Judge Torres, that is an important one in that even a circulator who submits to a subpoena, it's not realistic to go find them when they're circulating in another state or to go through the subpoena process within 30 days. And Julie Flynn does speak to this exact within her affidavit. But more importantly, that there is an interest in ensuring that only Mainers exercise their constitutionally reserved right, that the circulation of petitions is an essential component of the initiative process. And several courts have recognized, including the Supreme Court, that states have a compelling interest in limiting participation in their political process to state residents. And that's what distinguishes a case like this about initiatives from cases about Senate candidates or House candidates, the Griswold case. So your view would be the same for state governor? You couldn't have an out-of-state to participate in an election for state governor as a nominating petition? Potentially. I think that raises a closer issue. Why? Why? Because this is the same. I'd have to look at what the Constitution specifically says as to that component of the nominating petition and the role of the circulator there. But here, the Constitution is very clear as to the importance of the circulator to the initiative process as a component of the legislative power and how vital that role is. And that's what the IRI case and Hart case both recognized were compelling interests. And that is a threshold map. And then just to clear it up with my remaining time, Your Honors, because I know there was some questioning, Judge Barrett, about precisely what out-of-staters and in-staters can do. I just wanted to read from the statute. A circulator of petitions solicits signatures for the petition by presenting the petition to the voter, asking the voter to sign the petition, and personally witnessing the voter affixing the voter's signature to the petition. So those are the aspects of circulation. It does not prevent an out-of-stater from standing next to a petition circulator and advocating for the petition. That sort of speech is not in any way restricted by Maine's Constitution or Maine's laws. Can I say the statute does seem to say that the circulator solicits signatures, asks the voter to sign, and then personally witnesses them. In other words, it does seem, if you ban out-of-staters, that they're not allowed to solicit or ask to sign. You know, this hasn't, the exact scope, it's a good question, the exact scope of the statute has not been addressed by any judicial proceeding. But the Secretary's position is that someone could come from out-of-state and sit there and say, this is a great petition, you should support it. And that that wouldn't be running afoul of the statute or the Constitution. Can they hold the clipboard? So I don't think so under, based on this, based on the wording of the statute. Again, it hasn't come up in a judicial case. I think the act of circulation and the most important pieces, as you suggested, Judge Barron, being watching someone sign the petition, verifying they are who they say they are. And that's because of the short period of time the Secretary has to actually review the thousands upon thousands of signatures for these initiative petitions. That's the vital, essential role that the circulator plays in the process. It's how the two separate interests play off one another. They are distinct, but I think both important in justifying any burden on First Amendment rights. Is there any evidence that the Secretary has ever called in a circulator and asked him some questions as part of the process? Um, I don't know if we have evidence to that front. I believe Julie Flynn's affidavit, and I apologize, I don't have it in front of me, suggests that questions are asked. And the problem is we don't have evidence as to out-of-staters not responding to questions because this has been the rule for 100 years. The counterfactual is not going to be within the record. The concern, though, is that the counterfactual was such that it's your justification is that the Secretary of State is going to need to question someone. And if they're out-of-state, it's harder to do that. So my question is, well, with the in-state ones for the last 100 referenda, have they ever had to call in someone and question them? I believe so, Your Honor. I mean, we have, so paragraph 21 of Julie Flynn's affidavit does indicate the number of signatures that need to be reviewed and that if questions or issues arise concerning petitions circulated by particular individuals, they have very little time to try to contact those circulators. I don't have evidence of particular instances of when they have reached out to circulators, but my understanding is, yes, this is a common Is there anything in the record showing that they've ever asked? Not naming the person, but is there anything in the record showing they have ever asked anyone? I'm not sure if we have that exact language in the record, Your Honor, but that's the underlying assumption behind paragraph 21, not that there's anticipated need that has never existed. Well, it seems the record says this is something that could happen. There's no suggestion in the record it ever has happened, but, you know, if it does, then we might be prejudiced if the person's in New Hampshire. Yeah, and I think questions do arise when there are issues with, for example, you know, whether the circulator's oath is legible or if there's a concern about where someone's residence is or if, you know, where a particular person lives. It sounds like the record on this point is about what the record is on what they're going to do in the next referendum. We don't have the specific, I'll admit, Your Honor, we don't have a specific line that says we ask questions with X frequency, have done so this number of times, but in the record we do have the decisions on a variety of other petition campaigns. I'm just not sure. So you're asking us to draw an inference in your favor on that uncertain record, but then with respect to what's going to happen with respect to the next referendum, you're saying we shouldn't draw an inference in their favor. Well, I think so, you're right, and the burdens do are different on each of those, but I understand your point, Judge Barry, and I think it's our argument here is it's a matter of logic and reason that questions come up in the 30-day period in which this review occurs, and it does as a matter of practice happen. We could submit evidence to that end, but you're right that it's not, we don't have in the record currently an indication that questions happened this often or the last campaign we asked X number of questions. Thank you, Mr. Anton. Thank you. That concludes argument in this case. Attorney Anton and Attorney Rossi, you should disconnect from the hearing at this time.